# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**RANDY MCCAA,**

                **Plaintiff,**

v.                                      Case No. 20-CV-30

**RYAN BAUMANN,**

                **Defendant.**

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      Plaintiff Randy McCaa, a prisoner currently confined at Waupun Correctional Institution who is representing himself, brings this lawsuit under 42 U.S.C. § 1983. (ECF No. 1.) McCaa was allowed to proceed on an Eighth Amendment deliberate indifference claim against defendant Ryan Baumann for failing to address McCaa's attempts at self-harm on September 12, 2015 at Green Bay Correctional Institution. Baumann filed a motion for summary judgment. (ECF No. 18.) For the reasons stated below, I will deny Baumann's motion for summary judgment.

## FACTS

*1.    Procedural Background*

      On July 10, 2020, the court granted McCaa permission to supplement his summary judgment response materials by October 26, 2020. (ECF No. 34.) Baumann filed his motion for summary judgment four days after the court issued its scheduling order, and McCaa felt he had to timely respond to the summary judgment motion even though he did not have the

benefit of discovery. Once McCaa brought this to the court's attention, the court allowed him to conduct discovery and then file a supplemental response. The court also allowed for Baumann to file a supplemental reply. McCaa then twice requested extensions to file his supplemental materials, which the court granted via text only orders. (ECF Nos. 42, 43.) McCaa's supplemental materials were ultimately due on or before December 28, 2020. (ECF Nos. 42, 43.)

On January 4, 2021, Baumann filed a notice of non-opposition stating that McCaa failed to timely submit his supplemental materials. (ECF No. 44.) McCaa filed a motion requesting that the court disregard Bauman's notice of non-response, asserting that he submitted his materials to the Waupun law library on December 27, 2020. (ECF No. 54.) In support of his motion, McCaa submitted a response from Waupun staff to an information request explaining that because the law library was closed from December 24, 2020 through January 3, 2021, the law library e-filed his supplemental materials on January 4, 2021. (ECF No. 54-1.) The Clerk of Court's office also treated McCaa's materials as filed December 27, 2020, even though they were not docketed until January 4, 2021. Baumann, in his supplemental reply, acknowledges this. (ECF No. 49 at 1, n.1.)

Accordingly, the court will grant McCaa's motion to disregard Baumann's notice of non-opposition. The court accepts McCaa's supplemental response brief and supplemental proposed findings of fact as timely and will consider them where appropriate.

2. Facts

Around 6:00 p.m. on September 12, 2015, McCaa used a razor blade to cut his neck. (ECF No. 50, ¶ 34.) When Officer Valle, not a defendant, saw what McCaa had done, he notified his superiors. (*Id.* ¶ 35.) McCaa showed Valle the razor blade. (*Id.*) Sgt. Ash, not a

defendant, arrived first to McCaa's cell, Cell 239. (*Id.* ¶ 36.) At that point, McCaa used his mattress to shield himself and refused to relinquish the razor blade. (*Id.*) McCaa then partially covered his window. (*Id.*) Defendant Baumann arrived shortly thereafter and ordered McCaa to remove his window covering and hand over the razor blade. (*Id.* ¶ 37.)

McCaa states he falsely told Baumann that he swallowed the razor blade. (*Id.* ¶ 38.) Baumann disputes McCaa ever said this. (*Id.*) Then, while he was hiding behind the mattress, McCaa asserts he hid a sharp pen tip and the razor in his pubic hair "right in Captain Baumann['s] face." (*Id.* ¶ 40.) Baumann states that because of the mattress, he could only see McCaa "from the chin up." (ECF No. 20, ¶ 5.) Baumann saw McCaa was bleeding from his neck, but while both McCaa's hands were on the mattress, Baumann could tell he was not self-harming. (*Id.* ¶ 7.) However once McCaa's hands disappeared behind the mattress, Baumann ordered McCaa to show his hands. (*Id.*) When McCaa refused, Baumann decided to use incapacitating agents to gain McCaa's compliance. (*Id.*) Eventually the incapacitating agents worked, and McCaa agreed to be put into handcuffs. (ECF No. 50, ¶ 43.) Baumann asked McCaa where the razor blade was, and it is undisputed that McCaa told Baumann he threw it down the shower drain. (*Id.*)

Baumann then ordered McCaa to be strip-searched. It is undisputed that the strip-search was the type where staff directs an inmate how to stand and position himself to allow the staff to visually inspect the inmate's person. (*Id.* ¶ 45.) McCaa describes this as "strip-searching himself" and notes that because staff did not physically search him, he was able to continue to conceal the sharp pen tip and the razor blade within his pubic hair. (*Id.*) It is undisputed that the strip search did not uncover any contraband, including the pen tip and the razor. (ECF No. 45, ¶ 12.)

3

After the search, McCaa was placed on observation status and placed into Cell 208. (*Id.* ¶ 13.) Cell 239 was then searched, and no razor blade or other contraband was found. (ECF No. 20, ¶ 13.) Once in Cell 208, McCaa covered his window with a black security mat. (ECF No. 45, ¶ 14.) McCaa states he yelled at Baumann that he had a sharp pen tip and would continue to cut himself, but Baumann disputes that McCaa said this to him. (ECF No. 50, ¶ 47.) Once McCaa covered his cell window, however, it is undisputed that Baumann engaged the help of Officer Ver Haagh (not a defendant) who is a trained member of the GBCI crisis negotiations team. (ECF No. 45, ¶ 15.)

Ver Haagh arrived around 7:30 p.m. and talked with McCaa for two hours. (ECF No. 20, ¶ 16.) Ultimately Ver Haagh's efforts were unsuccessful; McCaa told Ver Haagh that he was done talking, that he had a sharpened pen tip, and that he would use it to cut himself. (ECF No. 50, ¶ 49.) Because his shift was ending, Ver Haagh left around 9:30 p.m. (ECF No. 20, ¶ 16.) At that point, Baumann decided to execute a cell extraction because McCaa was refusing to take down his window covering and relinquish the materials he claimed to have. (*Id.* ¶¶ 17–18; ECF No. 45, ¶¶ 17–18.)

McCaa was successfully extracted and taken to Cell 621. (ECF No. 50, ¶ 56.) Another staff-directed strip-search (as opposed to a staff-assisted strip search) was conducted and nothing was found. (ECF No. 20, ¶ 19.) McCaa again states that because he was allowed to search himself instead of staff searching him, he was able to conceal the sharp pen tip and the razor blade in his pubic hair. (ECF No. 45, ¶ 19.)

McCaa then returned to observation Cell 208, and at 11:15 p.m. Baumann came to check on him.[1] (ECF No. 45, ¶ 21.) McCaa asserts he told Baumann that he still had sharp objects, stated he was going to cut himself, and showed him the razor blade and sharp pen tip he had previously hidden in his pubic hair. (ECF No. 50, ¶ 60.) According to McCaa, Baumann responded by saying, "Well, I don't see no injury yet that is endangering your safety, so I'm not concerned about contraband." (*Id.* ¶ 61. Baumann disputes that this conversation happened and asserts that McCaa was calm and refused to talk to him. (*Id.* ¶ 60.)

At 12:35 a.m. on September 13, 2015, McCaa cut himself with a sharp pen tip. (*Id.* ¶ 64.) McCaa states that he "erupted a vein in his arm causing him to bleed and squirt blood all over his cell." (*Id.*) When Baumann responded to the report that McCaa cut himself, McCaa relinquished the sharp pen tip. (ECF No. 50, ¶ 65.) McCaa would not allow Baumann to treat his wounds, but Baumann asserts that McCaa's wound quickly clotted and stopped bleeding on its own without medical intervention. (ECF No. 20, ¶ 23.) McCaa states he did not refuse medical care, and at 2:30 a.m., a nurse cleaned his would and closed it with "stri-strips" and a Band-Aid. (ECF No. 50, ¶¶ 66, 69.) On the advice of Dr. Hamilton, not a defendant, McCaa was placed in bed restraints. (ECF No. 20, ¶¶ 23–24.) McCaa asserts that at point, he still had a razor blade and used it to cut away at the bed restraints and then swallowed it. (ECF No. 47, ¶ 70.) He was released from the bed

---

[1] In his original reply brief, Baumann makes much of the fact that the only incident report McCaa filed related to this case stated that this exchanged happened at 9:00 p.m. (ECF No. 28 at 2.) However, after McCaa was allowed to supplement his response and submit supplemental proposed findings of fact, Baumann did not dispute that this exchange happened at 11:15 p.m. (ECF No. 50, ¶ 58.)

5

restraints at 1:30 p.m. that same day. (*Id.* ¶ 72). He finally relinquished the razor two days later and was placed on a seven-day sharps restriction. (*Id.* ¶ 73.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

6

# ANALYSIS

1. *Applicable Law*

Under the Eighth Amendment, prison officials have an obligation to make sure that they take "reasonable measures" to guarantee inmate safety and prevent harm. *Farmer v. Brennan*, 511 U.S. 825, 834–35 (1994). This includes protecting inmates from self-harm as "the obligation to intervene covers self-destructive behaviors up to and including suicide." *Miranda v. County of Lake*, 900 F.3d 335, 349 (7th Cir. 2018). A failure to intervene claim in this context "has both an objective and a subjective element: (1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to the prisoner's health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006).

"When a claim is based upon the failure to prevent harm, in order to satisfy the first element, the plaintiff must show that the inmate was 'incarcerated under conditions imposing a substantial risk of serious harm.'" *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001) (quoting *Farmer*, 511 U.S. at 832). "It goes without saying that '[s]uicide is a serious harm'" and constitutes a substantial risk to an inmate's health or safety. *Id.* (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996)). The parties do not dispute that on September 12 and September 13, 2015, McCaa was engaging in self-harming and suicidal behavior.

The second element "requires a dual showing that the defendant: (1) subjectively knew the prisoner was at a substantial risk of committing suicide and (2) intentionally disregarded that risk." *Collins*, 462 F.3d at 761. For "the first showing, 'it is not enough that

there was a danger of which a prison official *should have been* aware,' rather 'the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000)) (emphasis in original). In other words, the official must be subjectively aware "of the significant likelihood that an inmate may imminently seek to take his own life." *Id.* Also, this "risk of future harm must be 'sure or very likely' to give rise to 'sufficiently imminent dangers' before an official can be held liable for ignoring that risk." *Davis-Clair v. Turck*, 714 F. App'x 605, 606 (7th Cir. 2018) (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008) (Roberts, C.J., plurality opinion)). For the second showing, the plaintiff must show that the prison official "failed to take reasonable steps to prevent the inmate from performing the act." *Pittman ex rel. Hamilton v. Cty of Madison, Ill.*, 746 F.3d 766, 775–76 (7th Cir. 2014). "An official who responds reasonably to a risk of harm is not deliberately indifferent to it even if the official fails to avert the harm." *Davis-Clair*, 714 F. App'x at 607.

    2.    *Application to this Case*

Baumann and McCaa interacted on several occasions on the night of September 12, 2015. However, McCaa was allowed to proceed only on an Eighth Amendment claim related to their interaction at 11:15 p.m. (*See* ECF Nos. 9, 11.) Regarding this interaction, there is a genuine dispute of material fact. McCaa states that he showed Baumann the razor blade and the pen tip and told him he was going to cut himself. Baumann, in response, told McCaa he was unconcerned about the contraband and left.

Baumann, on the other hand, states that when he checked on McCaa at 11:15 p.m., McCaa would not talk to him and was sitting calmly in his cell. In other words, he had no

8

idea that McCaa still possessed the razor blade and the sharp pen tip and had no idea that McCaa was able to still cut himself.

This conflicting view of the incident, which requires credibility determination, cannot be resolved on summary judgment. Taking these facts in a light most favorable to McCaa, as I must, a reasonable juror could conclude that Baumann's actions amounted to deliberate indifference. Baumann saw the sharp implements, and McCaa told him he was going to cut himself. Baumann had also been dealing with McCaa's self-harming urges since 6:30 p.m. that night and had previously taken several preventative measures. McCaa also asserts that Baumann deliberately did nothing. Thus, according to McCaa, Baumann was subjectively aware that it was significantly likely McCaa was going to self-harm and ignored the imminent risk.

Baumann argues that his actions prior to 11:15 p.m. show that on balance, he did not disregard the risk of harm present so his actions when taken as a whole cannot constitute deliberate indifference. It is undisputed that Baumann did not ignore the imminent risk of self-harm during his other interactions with McCaa prior to 11:15 p.m. In fact, he arguably went above and beyond what was necessary to address the risk. However, what matters is what he did at 11:15 p.m. If McCaa showed Baumann the sharp implements and he did nothing at that point in time to retrieve those objects, then a reasonable juror could conclude that Baumann was deliberately indifferent to the risk of harm presented to McCaa despite Baumann's earlier actions.

Baumann fails to argue that even if McCaa's version of the events is accepted as true, Baumann's actions still could not amount to deliberate indifference. At most, Baumann points to *Lord v. Beahm*, 952 F.3d 902 (7th Cir. 2020), asserting that because McCaa's

9

wounds were ultimately "relatively minor," Baumann's action (or inaction) does not constitute an Eighth Amendment violation. (ECF No. 49 at 2.) However, McCaa's situation differs from the plaintiff in *Lord* in a couple ways. First, in *Lord*, the plaintiff's "physical injuries consisted only of minor scratches, quickly and easily treated with gauze bandages." *Lord*, 952 F.3d at 905. Here, there is a factual dispute as to how serious McCaa's injuries were. McCaa states he "erupted a vein" that squirted blood all over his cell. (ECF No. 50, ¶ 64.) Baumann asserts McCaa's wound stopped bleeding on its own without the need of medical attention. However, it is undisputed that McCaa received medical attention, and it was more than the gauze bandages that the plaintiff in *Lord* required. McCaa describes them as "stri-strips" and the court infers he meant "steri-strips," which are butterfly-shaped wound closure bandages. *See* https://www.amazon.com/3M-Steri-Strip-reinforced-Skin-closures/dp/B004WFXCSQ. This means McCaa caused an open wound on his body, which is more serious than the minor superficial scratches the plaintiff in *Lord* inflicted upon himself.

Second, the court in *Lord* determined that the Eighth Amendment did not apply because the evidence strongly suggested that the plaintiff's suicide attempt was insincere. The fact that the plaintiff was upset that an officer would not return to his cell and thus threatened self-harm solely to get her attention combined with the superficialness of the wounds led the court to conclude that the plaintiff suffered no form of injury. *Lord*, 952 F.3d at 905. Baumann presented no such evidence to suggest that McCaa's self-harm attempts were insincere or that he suffered no form of injury. In fact, the evidence on the record suggests that Baumann believed McCaa's attempts were completely sincere and the risk of injury was great. He conducted two strip-searches, a cell extraction, and engaged an expert

10

negotiator. Also, after McCaa successfully cut himself, Baumann engaged Dr. Hamilton and had McCaa restrained, suggesting that McCaa was still considered at risk of a tangible injury. Thus, *Lord* does not apply here because a reasonable fact finder could conclude that McCaa faced a sincere risk of injury and in fact suffered an injury.

McCaa and Baumann tell two completely different stories as to what happened at 11:15 p.m. on September 12, 2015. Baumann failed to present any evidence that would allow a reasonable juror to conclude that even if McCaa's version of the events is true, Baumann's actions did not amount to deliberate indifference. Accordingly, I find that there is a genuine issue of material fact.

    3.    *Qualified Immunity*

Baumann argues that even if the court concludes there is a genuine issue of material fact, the court should nevertheless grant summary judgment in his favor because he is entitled to qualified immunity. To determine whether qualified immunity applies, the court must consider "(1) whether the defendants violated a constitutional right, and (2) whether the constitutional right was clearly established." *Broadfield v. McGrath*, 737 F. App'x 773, 775 (7th Cir. 2018).

As discussed above, a reasonable juror could conclude that Baumann violated McCaa's constitutional rights when he failed to do anything after McCaa showed him the sharp objects he had in his possession. The only question remaining is whether operating under the law as it existed in September 2015, a reasonable prison official would have known that ignoring an inmate after he showed the official the implements and stated he was going to cut himself constituted deliberate indifference. Baumann argues that there is no precedent putting him on notice that he was required to act differently in this case. (ECF

11

No. 19 at 8.) However, it was well-established in 2015 that if a prison official failed to address an inmate's suicidal and self-harming tendencies after he was alerted to it, it would constitute deliberate indifference. *See Woodward v. Correctional Medical Servs. of Ill., Inc.*, 368 F.3d 917, 926–27, 929 (7th Cir. 2004) (jail managers would be guilty of deliberate indifference if they took no precaution against the possibility of an inmate's suicide); *Cavalieri v. Shepard*, 321 F.3d 616, 623 (7th Cir. 2003) ("no doubt" the right of an inmate to be free from deliberate indifference to his risk of suicide was clearly established in 1998). As such, Baumann is not entitled to qualified immunity, and his motion for summary judgment is denied.

Because McCaa's claim survived summary judgment, the court will recruit counsel to represent him. Once an attorney is recruited, the court will provide McCaa with an agreement, which he may sign if he agrees to accept representation under the conditions the court provides. Once counsel is on board, the court will set up a scheduling conference with the lawyers, to discuss next steps.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that McCaa's motion to disregard Baumann's notice of non-opposition (ECF No. 54) is **GRANTED.**

**IT IS FURTHER ORDERED** that Baumann's motion for summary judgment (ECF No. 18) is **DENIED.**

**IT IS FURTHER ORDERED** that counsel will be recruited to represent McCaa.

Dated at Milwaukee, Wisconsin this 15th day of March, 2021.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge